**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CRANIAL TECHNOLOGIES, INC., | Case No.:  2:23-cv-02320-CBM-E |
| Plaintiff, | **ORDER RE: CLAIMS CONSTRUCTION BRIEFS** |
| v. | |
| OTTOBOCK SE & CO. KGAA, ACTIVE LIFE LLC, and OTTO BOCK HEALTHCARE LP, | |
| Defendants. | |

The matters before the Court are the parties' claims construction briefs. (Dkt. Nos. 75-76, 87, 88.)

## I.    BACKGROUND

This is a patent infringement case.  The operative complaint asserts the following causes of action:  U.S. Patent No. 7,242,798 ("'798 Patent"); (2) infringement of U.S. Patent No. 7,227,979 ("'979 Patent"); (3) infringement of U.S. Patent No. 10,603,203 ("'203 Patent"); (4) infringement of U.S. Patent No. 10,846,925 ("'925 Patent"); and (5) infringement of U.S. Patent No. 10,726,617 ("'617 Patent").  (Dkt. No. 62, First Amended Complaint.)

## II.    STATEMENT OF THE LAW

**A.    Claim Construction in General**

Claim construction is the process of determining the meaning and scope of

1

the patent claims. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Claim construction is a matter of law, and is generally reviewed *de novo* on appeal, although underlying factual disputes must be reviewed for clear error.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 833 (2015).  "[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal citation and quotations omitted).  The words of a claim are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."  *Id.* at 1312 (internal citations and quotations omitted).  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  In these instances, a general purpose dictionary may be helpful.  *Id.*  "In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art."  *Id.*

**B.      Sources for Claim Construction**

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'"  *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  Those sources include the claim language, the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms,

and the state of the art. *Id.*

### 1. **Claim**

Claim construction "begins and ends" with the words of the claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "The claims themselves provide substantial guidance as to the meaning of particular claim terms," and "the context in which the term is used in the asserted claim can be highly instructive." *Phillips*, 415 F.3d at 1314. In addition to the words of the claim(s) being construed, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id*.

### 2. **Specification**

A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "[C]laims must be construed so as to be consistent with the specification, of which they are a part." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) (citations omitted). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316 (citations omitted). "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in

3

the specification, is regarded as dispositive." *Id.* (citations omitted).  Despite the specification's importance, limitations from the specification must not be read into the claims.  The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id*. at 1323.  Conversely, "an interpretation [which excludes a preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support." *Vitronics*, 90 F.3d at 1583.

### 3. Prosecution History

The prosecution history is also relevant intrinsic evidence.  While "the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation" and thus "often lacks the clarity of the specification," the prosecution history can nonetheless "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citations omitted).

### 4. Extrinsic Evidence

"Although [the Federal Circuit has] emphasized the importance of intrinsic evidence in claim construction, [it has] also authorized district courts to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* (citations omitted).  The use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate construction. *Teva Pharm.*, 135 S.Ct. at 841, 849.  "However, extrinsic evidence is considered less reliable and less useful in claim construction than the patent and its prosecution history." *Phillips*, 415 F.3d at 1318-19.  Intrinsic evidence is of paramount importance and primary focus. *See*

*Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 996 (Fed. Cir. 2006).

### III.    DISCUSSION

**A.    Claim Terms 51, 52, 53, and 54:  product-by-process limitations**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Product-by-process determinations are premature at the claim construction stage and should instead be addressed in conjunction with invalidity issues | Product-by-process limitation should be given no weight for purposes of invalidity |

"A product-by-process claim defines a product in terms of the process used to produce that product." *Epistar Corp. v. Lowes Cos., Inc.*, 326 F. Supp. 3d 952, 969 (C.D. Cal. 2018).  "It has long been the case that an old product is not patentable even if it is made by a new process." *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1366 (Fed. Cir. 2009).  Therefore, "[i]n determining validity of a product-by-process claim, the focus is on the product and not the process of making it." *Id.* at 1369.  However, in determining infringement of the claim, "the focus is on the process of making the product as much as it is on the product itself." *Id.* at 1370.  Here, Defendants seek a product-by-process determination for purposes of a future invalidity analysis, and therefore such a determination is premature at this stage.  *See Epistar Corp.*, 326 F. Supp. 3d at 969.  Accordingly, the Court declines to make a product-by-process determination for purposes of invalidity at this stage.

**B.    Claim Term 16, 21, and 23:  "trim line(s)"**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Plain and ordinary meaning in the context of the asserted patent(s). | "lines on a three-dimensional shape that, when cut, define the edges of the cranial remodeling device" |

Defendants argue the term "trim lines" is "unclear on its own" and therefore should be construed  as "lines on a three-dimensional shape that, when cut, define the edges of the cranial remodeling device." Defendants argue the meaning for "trim lines" can be understood with reference to Figures 23 and 24 "and related

descriptions in the specification."  Figures 23 and 24 in the '979 Patent are set forth below:

FIG. 23

FIG. 24

Defendants do not explain how Figures 23 and 24 support Defendants' narrow construction of the term.  Moreover, the specification explains Figures 23 and 24 "illustrate *exemplary* trim lines."  ('979 Patent at 17:38-39 (emphasis added).)

Defendants also argue "trim lines" refers to "lines that were cut, using a milling machine or a laser trimming machine on a copolymer cranial band vacuum formed onto a three-dimensional representation of a modified head to manufacture a cranial device, citing '979 Patent at 17:31-37 which provides:  "Neural network 1916 is thus trained to automatically generate trim lines.  Once generated, trim line data ***may be*** utilized to actually mill trim lines right onto the copolymer cranial band vacuum formed onto that three dimensional machine 1903 or machine 1907.  Machine 1907 may be a laser trimming machine."  (Emphasis added.)  The cited portion of the '979 Patent relied on by Defendants does not use the word "cut" and makes clear that trim lines "may be" but are not required to be milled.  Therefore, Defendants do not demonstrate the term "trim line(s)" should be construed as something other than its plain and ordinary meaning.  *See Phillips*, 415 F.3d at 1312 (the words of a claim are generally given their ordinary and customary meaning).

6

Accordingly, the terms "trim line" / "trim lines" are construed as their plain and ordinary meaning.

### C.    Claim Terms 25, 29, 31, 35, 41, 43, 47, 49, 52, 54, and 55:  "contour lines"

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
| --- | --- |
| "trim lines" | "lines on a three-dimensional surface that define the final edges of the cranial remodeling device" |

"To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "clearly express an intent to redefine the term." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); *see also Phillips*, 415 F.3d at 1316.  Here, the Patents asserted expressly define "contour" as follows:  "The term 'contour' as used herein is the shape that defines what in the past has been called 'trim lines' for cranial remodeling devices . . . ." ('925 Patent at 11:26-32; '617 Patent at 11:26-32; '203 Patent at 11:26-31.)  Despite the express definition of "contour" stated in the patents, Defendants argue "contour lines" as used in the patents refers to "the final shape on a three-dimensional surface that defines the actual edges of the cranial remodeling device/headwear," citing generally to the '925, '617, and '203 Patents and their file histories totaling 180 pages.  However, the file histories of the patents do not limit "contour lines" to a "final shape"; rather, the file histories show Plaintiff referred to "contour lines" during prosecution of the patents as the "edges" of a cranial remodeling device or headwear without limiting "contour lines" to the "final" edges or shape as proposed by Defendants.  (*See* Dkt. No. 75-16 at 9, 10, 27, 63; Dkt. No. 75-17 at 17, 21, 41; Dkt. No. 75-18 at 11-12.)  *See Phillips*, 415 F.3d at 1317.

Therefore, "contour line" / "contour lines" are construed to mean "trim lines."

7

D.    Claim Terms 26, 30, 37, 38, and 50: "contact"

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
| --- | --- |
| "directly or indirectly contact" | "touch" (plain and ordinary meaning) |

The parties each argue their proposed construction is the plain and ordinary meaning of the term "contact."

The words of a claim are generally given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312 (internal citation and quotations omitted). "Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean,'" including the claim language, the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art. *Id.* (citation omitted). Thus, the cases relied on by the parties which define "contact" for purposes of the specific patent at issue[1] are unhelpful here.

Defendants also rely on the Merriam-Webster Dictionary (2016) (defining contact as "*vb* 1: to come or bring into contact : TOUCH"), and Pocket Oxford English Dictionary (11th ed. 2013) (defining contact as "the state of touching something") in support of their proposed construction. Plaintiff argues

---

[1] *See TurboCare Div. of Demag Delaval Turbomachinery Corp. v. Gen. Elec. Co.*, 264 F.3d 1111 (Fed. Cir. 2001); *Arbmetrics, LLC v. Dexcom, Inc.*, 2019 WL 7290541, at *6 (S.D. Cal. Dec. 30, 2019); *Plantronics, Inc. v. Aliph, Inc.*, 2011 WL 4634066, at *2-3 (N.D. Cal. Oct. 6, 2011) *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1310 (Fed. Cir. 2002); *All Cell Techs., LLC v. Chervon N. Am. Inc.*, 2021 WL 2986286, *14 (N.D. Ill. July 15, 2021).

Defendants' reliance on the two general-usage dictionaries is improper because of the lack of ambiguity in the intrinsic record including the specification's embodiments which contemplate indirect contact, and neither dictionary is for the field of the invention regarding cranial remodeling orthotics.  While "technical dictionaries" may assist the court "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms," "a general-usage dictionary cannot overcome art-specific evidence of meaning." *Phillips*, 415 F.3d at 1318, 1322.  Moreover, extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence" and should not be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1319, 1324.

Here, the specifications of the asserted patents use the term "contact" to refer to one inner layer (*see* Figure 11, inner layer 1101 below) out of a "plurality



FIG. 11

of layers" in the interior of the cranial remodeling device which "is to contact the head" while other portions of the interior surface of the cranial remodeling device is "to be spaced apart from the head," which demonstrates the ordinary meaning of the term means direct touching—not indirect touching or indirect contact as proposed by Plaintiff.  (*See* '203 Patent at 3:8-9.)[2]  Under Plaintiff's proposed

[2] *See also* '203 Patent at 5:11-14, 13:37-40.'203 Patent at 6:24-25, 7:7-10, 7:32-37, 8:26-28, 8:42-48, 8:65-67, 14:3-5, 15:14-15, 15:40-46.

definition which includes indirect contact, the outer layers would also "contact" the head, but the language in the Patents do not describe any layer other than the interior layer as having "contact" with the head. *See On-Line Tech. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1138 (Fed. Cir. 2004); *Aubin Indus., Inc. v. Caster Concepts, Inc.*, 2017 WL 4284715, at *4 (E.D. Cal. Sept. 27, 2017).

Therefore, "contact" is construed to mean "touching."

**E.    Claim Terms 5, 9, 11, 16-18, 20-21, 29-31, 33-35, 40-43, 45-47, and 52: "utilizing" and "processing"**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Plain and ordinary meaning in the context of the asserted patent(s). No step-plus function limitation. | Step-plus function limitation |

The parties dispute whether a step-plus function limitation applies to these disputed claim terms. 35 U.S.C. § 112(f) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." The means-plus-function limitations in Section 112(f) correspond to the non-recitation of "structure and material ... in support thereof" whereas step-plus-function limitations correspond to the non-recitation of "acts in support thereof." *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997). Section 112(f) "is implicated only when steps *plus function* without acts are present." *Id.* (emphasis in original). Therefore, the use of the phrase "step for" gives rise to a rebuttable presumption that § 112(f) applies. *See Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002); *Dynamic Digital Depth Rsch. PTY LTD v. LG Elecs., Inc.*, 2016 WL 7444569, at *11 (C.D. Cal. Nov. 7, 2016). Conversely, the absence of the phrase "step for" gives rise to a rebuttable presumption that § 112(f) does not apply. *Masco Corp.*, 303 F.3d at 1326; *see also Dynamic Digital Depth Rsch.*

*PTY LTD*, 2016 WL 7444569, at *11.  "A claim element that does not recite express step-plus-function language may nevertheless be a step-plus-function limitation if it recites only an underlying function without acts for performing it." *Dynamic Digital Depth Rsch. PTY LTD*, 2016 WL 7444569, at *11.  However, in order to rebut the presumption that Section 112(f) does not apply, there must be a showing that "the limitation contains no act."  *Vaporstream, Inc. v. Snap Inc.,* 2018 WL 11350657, at *10 (C.D. Cal. Feb. 27, 2018) (citing *Masco Corp.*, 303 F.3d at 1327).[3]  The Federal Circuit has cautioned, "we must be careful not to extend the language of [§112(f)] to situations not contemplated by Congress.  If we were to construe every process claim containing steps described by an 'ing' verb, such as passing, heating, reacting, transferring, etc. into a step-plus-function limitation, we would be limiting the claims in a manner never intended by Congress."  *OI Corp.*, 115 F.3d at 1583.

Here, there is a rebuttable presumption that Section 112(f) does not apply because the claims do not use the phrase "step for."  *See Masco Corp.*, 303 F.3d at 1326; *Dynamic Digital Depth Rsch. PTY LTD*, 2016 WL 7444569, at *12.  In order to rebut the presumption that Section 112(f) does not apply, Defendants must show "the limitation contains no act."  *Masco Corp.*, 303 F.3d at 1326; *see also Dynamic Digital Depth Rsch. PTY LTD*, 2016 WL 7444569, at *12. Defendants argue Claim 1 of the '617 Patent is written in step-plus function format with the step of "processing said three-dimensional head data file" performing the function of "identify[ing] predetermined reference points," but the corresponding acts to carry out the function are missing from the specification. ('617 Patent ¶¶ 61-64.)  Defendants contend the '617 Patent describes how to calculate contour lines based on reference points but not how the program

---

[3] *See also Dynamic Digital Depth Rsch. PTY LTD*, 2016 WL 7444569, at *11; *Neurografix v. Regents of Univ. of California*, 2012 WL 8281409, at *6 (C.D. Cal. June 13, 2012) (citing *Masco Corp.*, 303 F.3d at 1327).

"mathematically defin[es]" reference points in the first place, and the only thing that can be "gleaned" from the specification is that the claimed steps are performed by a "program." (*Id*. ¶¶ 65-68.) Therefore, Defendants contend because the specification lacks the acts necessary to perform the claimed function, the claim should be held indefinite under 35 U.S.C. § 112(b). Defendants do not identify any Federal Circuit decisions applying their theory of indefiniteness for determining Section 112(f) applicability for steps-plus function claiming. Instead, Defendants rely on a single district court decision in *NeuroGrafix v. Siemens Med. Sols. United States, Inc.*, 2011 U.S. Dist. LEXIS 89568 (C.D. Cal. May 5, 2011), wherein the district court found the claim term "processing said data representative of anisotropic diffusion to generate a data set describing the shape and position of said selected structure in the region" was indefinite because it had no corresponding acts. However, the following year, the district court disavowed its *Siemens* decision in *Neurografix v. Regents of Univ. of California*, 2012 WL 8281409, at *6-7 (C.D. Cal. June 13, 2012).

        Here, the Court finds the indefinite analysis for means-plus function limitations does not apply to step-plus function limitations. *See O.I. Corp.*, 115 F.3d at 1583; *Word To Info Inc v. Facebook Inc.*, 2016 WL 3690577, at *26 (N.D. Cal. July 12, 2016), *aff'd sub nom. Word to Info, Inc. v. Facebook Inc.*, 700 F. App'x 1007 (Fed. Cir. 2017); *Neurografix v. Regents of Univ. of California*, 2012 WL 8281409, at *7; *In re Neurografix ('360) Pat. Litig.*, 201 F. Supp. 3d 206, 216 (D. Mass. 2016). Thus, Defendants must show "the limitation contains no act" to rebut the presumption that Section 112(f) does not apply. *See Masco Corp.*, 303 F.3d at 1326; *Dynamic Digital Depth Rsch. PTY LTD*, 2016 WL 7444569, at *12. However, the claims recite an act—"utilizing" or "processing." Therefore, because the claim language does not recite the words "step for," and the claim language recites the act of "utilizing" or "processing," 35 U.S.C. § 112(f)'s step-plus function limitation does not apply. *See Neurografix v. Regents of Univ. of*

*California*, 2012 WL 8281409, at \*7; *Word To Info Inc.*, 2016 WL 3690577, at \*25-27; *In re Neurografix ('360) Pat. Litig.*, 201 F. Supp. 3d at 215-17.

Defendants argue to the extent the Court finds these terms are not step-plus function, the "utilizing" and processing" terms in the '979 and '798 Patents should be construed as limited to a "trainable computer" performing certain operations "without human intervention." Defendants argue that the specification supports this construction because it only describes a computer program determining and generating the device shape, rather than a user doing so manually on a digital platform. However, the specifications relied on by Defendants describe "trainable computer programs" as one "illustrative embodiment" of the invention or "one aspect of the invention." (*See* '979 Patent at 3:43-67; '798 Patent at 9:22-65.) Moreover, the term "trainable computers" is used in other claims, but the relevant claims for the disputed terms "utilizing" or "processing" do not use the words "trainable computers."[4] Thus, the claim language defines the scope of the patent right which do not limit the terms "utilizing" or "processing" to a trainable computer" as proposed by Defendants. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346-47 (Fed. Cir. 2015) (citing *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998)).

Accordingly, the terms "utilizing" and processing" are construed as their plain and ordinary meaning.

**F.  Claim Terms 28, 29, 31, 35, 40, 41, 43, 47, and 52: "calculating," "identifying," "determining"**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Plain and ordinary meaning in the context of the asserted patent(s). | "having a program mathematically derive" |

---

[4] *Compare* '979 Patent, Claim 1 at 18:8-17, Claim 2 at 18:18-20, Claim 5 at 29-32, Claim 9 at 19:56-67; '798 Patent, Claim 1 at 17:63-18:4, Claim 19 at 19:23-33, Claim 28, at 20:7-9; '925 Patent, Claim 1 at 16:57-17:20, Claim 7 at 17:46-50, Claim 17 at 18:29-57; and '617 Patent, Claim 1 at 16:63-17, *with* '979 Patent, Claim 23 at 20:5-13, Claim 29 at 37-39.

13

Here, the ordinary meaning of "identifying," "calculating" and "determining" does not require a program or a computer, and the plain and ordinary meaning of "identifying" and calculating" does not require being mathematically derived.[5] While the ordinary meaning of "calculating" includes to determine by mathematical processes, its ordinary meaning does not require a computer or program. The specifications do not clearly set forth a definition of these terms other than their plain and ordinary meaning, there is no limitation in the specifications to a "program" or "mathematically derived," and the embodiments are not limiting. *See Hill-Rom Servs., Inc.*, 755 F.3d at 1371; *Phillips*, 415 F.3d at 1316, 1323; *Delta T LLC v. MacroAir Techs., Inc.*, 2021 WL 3721455, at *20 (C.D. Cal. Mar. 29, 2021).

Therefore, "calculating," "identifying," and "determining" are construed as their plain and ordinary meaning.

**G.     Claim Terms 9, 14, 20, and 24:  "desired shape"**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Plain and ordinary meaning in the context of the asserted patent(s). | "desired head shape" |

Here, Plaintiff's proposed construction omits the term "desired" from the term, and the portions of the patents relied on by Plaintiff which use "shape" to refer to "internal shape," "helmet shape" or "cast shape" do not refer to the "desired shape" language. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (citing *In re Danly*, 263 F.2d 844, 847 (U.S. Ct. of Customs and Patent Appeals 1959)); *HBAC Matchmaker Media, Inc. v. Google Inc.*, 650 F. App'x 990, 993 (Fed. Cir. 2016); *Applied Signal Tech., Inc. v. Emerging Markets*

---

[5] Merriam-Webster dictionary defines determining as "to fix conclusively or authoritatively" or "to settle or decide by choice of alternatives or possibilities,"; defines identifying as "to ascertain the identity of (someone or something that is unfamiliar or unknown)"; and defines calculating as "to determine by mathematical processes" or "to design or adapt for a purpose."

*Commc'ns, Inc.*, 2011 WL 500786, at *6 (N.D. Cal. Feb. 9, 2011). In contrast, the term "desired shape" as used in the Patents refer to head shapes. (*See, e.g.,* '798 Patent at 1:37-44, 1:47-50; '979 Patent at 1:45-45, 1:47-56.)[6]

Therefore, "desired shape" is construed to mean "desired head shape."

**H.     Claim Terms 27, 32, 39, and 44: "generating a three-dimensional [head] data file [for/of] [a shape] of said [deformed] head [shape]"**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Plain and ordinary meaning in the context of the asserted patent(s). | "creating the initial file of three-dimensional data corresponding to the shape of said head" |

Here, Defendants' proposed construction would exclude embodiments disclosed in the specification regarding generation of a head data file without capturing a three-dimensional data file representative of the head at a clinic. *See Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008); *Delta T LLC*, 2021 WL 3721455, at *20. Moreover, the '617 and '925 Patents do not disclaim generating head data files other than the "'initial' file after image capture." *See Phillips*, 415 F.3d at 1316, 1323.

Therefore, "generating a three-dimensional [head] data file [for/of] [a shape] of said [deformed] head [shape]" is construed as its plain and ordinary meaning.

**I.     Claim Terms 4, 6, 8, 15, and 19: "capturing"**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Plain and ordinary meaning in the context of the '798 and '979 Patents. | "producing digital data that represents the entirety of a deformed head and which is obtained from a substantially instantaneous capture" |

Defendants argue these terms are the "equivalent method step for the 'digitizer' that the specification asserts overcame shortcomings in prior art image capture systems, and should be construed accordingly." Defendants contend the

---

[6] *See also* '798 Patent at 9:22-41, 14:18-32, 17:44-52.

specification discussed the disadvantages of prior art image capture systems, and explained that the prior art systems "fail to recognize the particular unique challenges and requirements necessary for a system for the production of digital images of infant heads." ('798 Patent at 2:51-54.) However, the Federal Circuit has held that "comparing and contrasting the present technique to that of the prior art does not 'rise to the level of [a] clear disavowal' of claim scope." *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019); *see also AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 976 (Fed. Cir. 2013); *Storage Tech. Corp. v. Cisco Systems, Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003).

Defendants attempt to read in a requirement of a "digitizer" for the term "capturing." The patents state "[a]s used herein, the term 'digitizer' is utilized to identify a data capture system that produces digital data that represents the entirety of a cast or a head and which is obtained from a substantially instantaneous capture." ('798 Patent at 9:50-54; '979 Patent at 9:66-10:3.) However, the disputed "capturing" terms do not recite a digitizer, whereas other unasserted claims of the patents recite a "digitizer operable to capture [three dimensional] digital image [data] of a [deformed / patient's] head to produce first digital data." ('798 Patent, Claims 29-55; '979 Patent, Claims 14-22.) Moreover, other parts of the patents describe the invention without using the term "digitizer." (*See* '798 Patent at 1:26-29, 3:45-54.) Therefore, construing the "capturing" terms to include the requirements of a digitizer as proposed by Defendants would render superfluous and redundant other claims' express recitation of a digitizer. *See HBAC Matchmaker Media*, 650 F. App'x at 993; *Delta T LLC*, 2021 WL 3721455, at *9.

Accordingly, "capturing" is construed as its plain and ordinary meaning.

**J.    Claim Terms 5, 7, 9-12, 16, 18, 20-22, 29, 31, 35-36, 41, 43, and 47-48: "automatically"**

| PLAINTIFF'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|

16

| Plain and ordinary meaning in the context of the asserted patent(s). | "without human control or intervention" |
|---|---|

The specifications for the '979 and '798 Patents describe some embodiments that use a "highly automated cranial remodeling band fabrication system." (*See* '798 Patent at 16:2-13; '979 Patent at 16:23-27.)[7]  By using the phrase "highly automated," the specifications do not preclude any human intervention or control and contemplate at least some non-automatic intervention. Moreover, the specifications do not refer to an entirely automated process for the entire invention. (*See* '798 Patent at 17:43-51; '979 Patent at 17:57-65.) Furthermore, the specification states in some embodiments the system "provide[s] an operator with information," thus demonstrating a human operator is involved in the process. (*See* '798 Patent at 16:52-61.)  Thus, the limitation in Defendants' construction to "without human control or intervention"[8] is not supported by the specification and would exclude embodiments described in the patents.  *See Phillips,* 415 F.3d at 1315; *On-Line Tech.*, 386 F.3d at 1138; *Aubin Indus., Inc.*, 2017 WL 4284715, at *4 (E.D. Cal. Sept. 27, 2017).

Therefore, "automatically" is construed as its plain and ordinary meaning.

## IV.   CONCLUSION

Accordingly, the Court adopts the following constructions of the disputed Claim Terms:

1.   No product-by-process determination for purposes of invalidity at this stage;

2.   "trim line" / "trim lines": plain and ordinary meaning;

---

[7] *See also* '798 Patent at 17:12-21.

[8] Courts have rejected similar arguments to construe the term "automatically" as without human intervention on the basis such construction is contrary to the plain meaning of the term and not supported by the intrinsic evidence. *See Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1351 (Fed. Cir. 2007); *Intellectual Ventures II LLC v. FedEx Corp.*, 2017 WL 5896180, at *21 (E.D. Tex. Nov. 29, 2017) (citing *CollegeNet, Inc. v. ApplyYourself Inc.*, 418 F.3d 1225, 1235-36 (Fed. Cir. 2005); *Augme Techs, Inc. v. Pandora Media, Inc.*, 2012 WL 6055010, at *7 (D. Del. Dec. 5, 2012); *SmartPhone Techs. LLC v. Research in Motion Corp.*, 2012 WL 3150756, at *18 (E.D. Tex. Aug. 2, 2012).

17

3.      "contour line" / "contour lines": trim lines

4.      "contact": touching;

5.      "utilizing" and processing":  no step-plus function limitation; plain and ordinary meaning;

6.      "calculating," "identifying," and "determining":  plain and ordinary meaning;

7.      "desired shape":  desired head shape;

8.      "generating a three-dimensional [head] data file [for/of] [a shape] of said [deformed] head [shape]": plain and ordinary meaning;

9.      "capturing":  plain and ordinary meaning; and

10.     "automatically": plain and ordinary meaning.

**IT IS SO ORDERED.**

DATED:  March 14, 2025.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE