**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| CRANIAL TECHNOLOGIES, INC., | Case No.: 2:23-cv-02320-CBM-E |
|---|---|
| Plaintiff, | **ORDER RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY OF THE ASSERTED CLAIMS OF U.S. PATENT NOS. 7,242,798 AND 7,227,979** |
| v. | |
| OTTOBOCK SE & CO. KGAA, ACTIVE LIFE LLC, and OTTO BOCK HEALTHCARE LP, | |
| Defendants. | |

The matter before the Court is Defendants' Motion for Partial Summary Judgment of Invalidity of the Asserted Claims of U.S. Patent Nos. 7,242,798 and 7,227,979.  (Dkt. No. 137.)

## I.    BACKGROUND

This is a patent case filed by Plaintiff Cranial Technologies, Inc. ("Plaintiff") arising from Defendants' alleged use of Plaintiff's patents regarding cranial helmets to treat cranial deformations in infants without authorization.  The First Amended Complaint ("FAC"), which is the operative complaint, asserts the following causes of action against Defendants:  (1) infringement of U.S. Patent No. 7,242,798 ("'798 Patent"); (2) infringement of U.S. Patent No. 7,227,979 ("'979 Patent"); (3) infringement of U.S. Patent No. 10,603,203 ("'203 Patent"); (4) infringement of U.S. Patent No. 10,846,925 ("'925 Patent"); and (5)

1

infringement of U.S. Patent No. 10,726,617 ("'617 Patent").  (Dkt. No. 62.)  On March 14, 2025, the Court issued an order re: the parties' claims construction briefs.  (Dkt. No. 134.)

## II.   STATEMENT OF THE LAW

On a motion for summary judgment, the Court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact.  *Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602, 609-10 (9th Cir. 2003); Fed. R. Civ. P. 56.  Summary judgment against a party is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A factual dispute is "material" only if it might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  *Id*. at 249.  In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor."  *Anderson*, 477 U.S. at 255.

## III.   DISCUSSION

Defendants move for partial summary judgment re the invalidity of the asserted claims of Plaintiff's U.S. Patent Nos. 7,242,798 ("'798 Patent") and 7,227,979 ("'979 Patent").

### A.   Abstract Idea

Defendants move for partial summary judgment re the invalidity of the asserted claims of the '798 Patent and '979 Patent on the basis the '798 and '979

Patents claim an abstract idea and therefore are ineligible for patent.

35 U.S.C. § 101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." The Supreme Court has held "this provision contains an important implicit exception: Laws of nature, natural phenomena, and ***abstract ideas*** are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (emphasis added). However, "an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Id*. at 217. In *Alice*, the Supreme Court set forth a two-step approach to determining patent eligibility under § 101. "Under *Alice*'s two-step approach, at step one 'we determine whether a claim is directed to a patent-ineligible concept, here an abstract idea,' and if the answer is yes, at step two 'we review whether the claim recites elements sufficient to transform it into a patent-eligible application of the abstract idea.'" *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1060 (Fed. Cir. 2026) (citation omitted). "Patent eligibility is a question of law that may be based on underlying factual findings." *Id.* (citations omitted).

Defendants argue under *Alice* Step One, the asserted claims for the '798 and '979 Patents are directed to a patent-ineligible concept because they are directed at the abstract idea of automating the fabrication of cranial remodeling devices, purely functional in nature, lack details on how to achieve the claimed automation, and merely recite a goal/result, not a solution. Defendants previously raised the same argument in their motion to dismiss, which this Court rejected in denying Defendants' motion to dismiss in its November 2, 2023 Order wherein this Court specifically found "the '798 and '979 patent claims are not directed to an abstract idea under *Alice* Step One, and are therefore patent eligible under 35 U.S.C. § 101." (Dkt. No. 41 (hereinafter, "MTD Order").)

Under the law of the case, "a court is generally precluded from

3

reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). A court's discretion to not apply the doctrine of the law of the case is "limited," but "a court may have discretion to reopen a previously resolved question under one or more of the following circumstances":

> (1) the first decision was clearly erroneous;
> (2) an intervening change in the law has occurred;
> (3) the evidence . . . is substantially different;
> (4) other changed circumstances exist; or
> (5) a manifest injustice would otherwise result.

*Thomas*, 983 F.2d at 155.

As to Defendants' contention that changed circumstances exist because none of the allegedly innovative embodiments such as "digitizer" or "neural network" are required by the asserted claims under the Court's claim construction which occurred after the MTD Order, the Court did not rely on any claim construction ruling on *Alice* Step One at the pleading stage. (*See* Dkt. No. 41 ("Plaintiff does not identify any ambiguity as to the definition of a term nor propose a specific claim construction in dispute demonstrating the need for claim construction prior to determining patent eligibility of the '798 and the '979 Patents under § 101. Accordingly, the Court finds it may determine patent eligibility with respect to the '798 and '979 Patents at the pleading stage.").)[1]

With respect to Defendants' contention that the Court should have the benefit of the full factual record when examining *Alice* Step One, this Court found at the pleading stage when "[v]iewing the claims for the '798 and the '979 Patents in light of the specifications" that "the claims are directed to a specific function that is an improvement over previous technology" and thus "the '798 and '979 patent claims are not directed to an abstract idea under *Alice* Step One, and are

---

[1] Moreover, Defendants stated in their reply in support of their motion to dismiss that "there is no claim construction dispute." (Dkt. No. 32 at 7.)

therefore patent eligible under 35 U.S.C. § 101." (Dkt. No. 41 (citing *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014); *CardioNet*, 955 F.3d at 1368-70; *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1335-37 (Fed. Cir. 2016)). The Court was not required to examine extrinsic evidence such as testimony and prior art to make its finding under *Alice* Step One at the pleading stage. *See CardioNet*, 955 F.3d at 1372-73. Therefore, the Court's prior ruling in its MTD Order is not clearly erroneous.

As to Defendants' contention that it would be manifestly unjust to allow Plaintiff to advocate for contradictory claim interpretations at the pleading stage vs. after the MTD Order without reconsidering *Alice* Step One under Plaintiff's current interpretation, the Court noted in the MTD Order that "[n]either Plaintiff nor Defendants dispute the definition of any particular term," and "Plaintiff does not identify any ambiguity as to the definition of a term nor propose a specific claim construction in dispute demonstrating the need for claim construction prior to determining patent eligibility of the '798 and the '979 Patents under § 101" and therefore the Court found "it may determine patent eligibility with respect to the '798 and '979 Patents at the pleading stage." (Dkt. No. 41.) Therefore, because Plaintiff took no position on claims construction at the pleading stage in opposition to Defendants' motion to dismiss as to *Alice* Step One, Plaintiff could not have taken a contradictory position after the Court's ruling on Defendants' motion to dismiss.

With respect to an intervening change in the law, Defendants state "the law on patent eligibility has not changed since 2023." Instead, Defendants argue *Recentive Analytics Inc. v. Fox Corp.*, 134 F.4th 1205 (Fed. Cir. 2025) is "highly instructive," but Defendants do not explain how that decision would warrant changing the Court's prior analysis under *Alice* Step One. Therefore, Defendants do not identify any intervening change in law demonstrating the law of the case should not apply to the Court's prior finding in its MTD Order regarding *Alice*

5

Step One.

Accordingly, the Court finds its prior ruling in its November 2, 2023 MTD Order that the '798 and '979 patent claims are not directed to an abstract idea under *Alice* Step One and are therefore patent eligible under 35 U.S.C. § 101, is the law of the case. Even if the Court's prior ruling in its MTD Order is not the law of the case, the Court finds the '798 and '979 patent claims are not directed to an abstract idea under *Alice* Step One and are therefore patent eligible under 35 U.S.C. § 101.[2]

**B. Anticipation**

Defendants also argue Plaintiff asserts two independent claims from the '798 Patent (claims 1 and 19) and two independent claims from the '979 Patent (claims 1 and 9) but there is no genuine dispute that the '353 Patent anticipates the asserted independent claims as a matter of law.

35 U.S.C. § 102(a) provides:

> A person shall be entitled to a patent unless . . . the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

"A patent is invalid for anticipation if a single prior art reference discloses ***each and every limitation*** of the claimed invention." *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (emphasis added); *see also Roland Corp. v. inMusic Brands, Inc.*, 2025 WL 926703, at \*10 (Fed. Cir. Mar. 27, 2025) (citing *Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1363 (Fed.

---

[2] Defendants argue under *Alice* Step Two, nothing in the asserted claims describes an inventive concept sufficient to transform the abstract idea into a patent-eligible application of that abstract idea. Because the '798 and '979 patent claims are not directed to an abstract idea under *Alice* Step One and are therefore patent eligible under 35 U.S.C. § 101, the Court does not proceed to step two of the *Alice* test. *See CardioNet*, 955 F.3d at 1368; *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1153 (Fed. Cir. 2019); *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1262 (Fed. Cir. 2017).

Cir. 2008)).  "Anticipation is a question of fact." *Id.* (citation omitted).  "The burden of proof [on the defendant] to invalidate . . . patent claims is a heavy one – clear and convincing evidence" and "[t]o obtain summary judgment of invalidity, [the defendant's] challenge [is] even greater: to show that no reasonable factfinder, taking the evidence in the light most favorable to [the plaintiff], could do anything other than find clear and convincing evidence of anticipation." *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 55 F.4th 1354, 1366 (Fed. Cir. 2022); *see also Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1364 (Fed. Cir. 2019).

Here, Claim 1 of the '798 Patent states:

> A method for producing cranial remodeling devices to correct for cranial shape abnormalities comprising: capturing a three dimensional digital image of a deformed head to produce first digital data; and utilizing said first digital data to automatically provide cranial remodeling device information for use in fabricating a cranial remodeling device for said deformed head.

(Dkt. No. 137-6 at 32.)  Claim 19 of the '798 Patent states:

> A method for producing a cranial remodeling device to correct for a cranial shape abnormality comprising: capturing a digital image of a deformed head to produce first digital data; automatically processing said first digital data to produce second data corresponding to a desired shape for use in forming a cranial remodeling device; and automatically providing cranial remodeling device information for use in fabricating a cranial remodeling device for said deformed head.

(Dkt. No. 137-6 at 33.)

Claim 1 of the '979 Patent states:

> A method for producing cranial remodeling devices to correct for cranial shape abnormalities comprising: capturing a three dimensional digital image of a deformed head to produce first digital data; and utilizing said first digital data to automatically provide cranial remodeling device trim line information for use in fabricating a cranial remodeling device for said deformed head.

(Dkt. No. 137-5 at 32 (emphasis added).)  Claim 9 of the '979 Patent states:

> A method for producing a cranial remodeling device to correct for a cranial shape abnormality comprising: capturing a digital image of a deformed head to produce first digital data; automatically processing

7

said first digital data to produce second data corresponding to a desired shape for use in forming a cranial remodeling device; utilizing said second data to automatically provide cranial remodeling device information for use in fabricating a cranial remodeling device for said deformed head said cranial remodeling device information comprising trim lines for a cranial remodeling device.

(Dkt. No. 137-5 at 32 (emphasis added).)

Defendants argue the first element of Claim 1 of the '798 and '979 Patents calls for "capturing a three dimensional digital image of a deformed head to produce first digital data" and contend "[a]s this term has been construed to encompass scanners, the '353 patent claims and discloses the same," relying on Figure 5 of the '353 Patent.  Defendants contend Figure 5 of the '353 Patent discloses "an expert based system" that uses the patient scan, along with other information, to operate "directly on the data representative of the patient's scanned head to produce data which is used to manufacture an orthosis."  Defendants argue the specification makes clear that anthropomorphic data supplements the scan—it does not replace it.

However, Defendants ignore the specification of the '353 Patent, which provides:

In this mode, the head shape scan data is received by the computer 130 from scanner 110. In addition, an operator will enter patient specific anthropomorphic information. The ***patient specific information will be utilized*** to select anthropometric data from the anthropomorphic data base which will enable the computer ***to determine the desired head shape*** for that individual patient.

('353 Patent at 6:31-38 (emphasis added.)  The '353 Patent also provides it is the "anthropomorphic information from which the desired head shape was produced."

('353 Patent at 6:45-46.)  The '353 Patent further provides:

The expert system resident on the computer 130 is utilized to further facilitate the selection design and fabrication of appropriate orthoses. A first classification protocol for abnormal head shapes is stored in a data base of the memory 132 of computer 130 along with ***patients actual 65 head shape data*** along with race sex age and other factors ***that influence selection of a preferred head shape***.  A second classification protocol is prepared that identifies desired head shape data ***based upon anthropometric data*** and other factors, and it is also stored on the computer memory.  A correlation is then established

8

that relates the first and second classification protocols.  From the protocols and patient data, an orthosis type is selected and the specifications for the orthosis are generated.

When a new patient is examined the head is scanned and head shape scan data is produced as described above Computer 130 being preprogrammed to utilize the criteria and first and second protocols selects a closest match between the new actual head shape and a preferred head shape. Using the preferred head shape match computer 130 informs an operator via computer display 135 of the identity of an orthosis designed for the selected preferred head shape.

('353 Patent at 6:60-7:14.)  Therefore, the '353 Patent discloses "selecting a closest match" between the patient's actual head shape and preferred head shape through classification protocols that are correlated based on anthropometric data— not scan data as Defendants contend.  Thus, the '353 Patent explains that the expert system produces a desired head shape using the operator-inputted patient-specific information, not the patient's scan.  (*See also* Mattie Rebuttal Report ¶¶ 175-80, 210-15; Mattie Depo. 511:5-24, 512:3-513:11.)

Moreover, Defendants misconstrue Figure 5 of the '353 Patent as showing "an expert system that includes scanning a patient, as well as storing, displaying, and modifying that scan." (Defendant's MSJ at 18.)  The '353 Patent describes Figure 5 as a "process flow diagram[]"; it does not teach that the expert system performs all of the listed functions. (*See* '353 Patent at 3:10.)  The description of Figure 5 does not state that the patent scan data is modified.  Defendants fail to explain how "scanning," "storing," or "displaying" a scan discloses utilizing scan data to automatically provide cranial remodeling device information as required by the claims.

Defendants also argue the second element of Claim 1 of the '798 and '979 Patents calls for "utilizing said first digital data to automatically provide cranial remodeling device information for use in fabricating a cranial remodeling device for said deformed head," the '979 Patent modifies the phrase "device information" to read "device trim line information" and Claim 19 of the '798 Patent and Claim 9 of the '979 Patent add limitations requiring the creation of "second data" from

the "first digital data," for use in fabricating the device, and contends the '353 Patent discloses the same particularly when "automatically" is construed broadly so as not to preclude human intervention.[3]  Defendants rely on Figure 4[4] and Figure 6[5] of the '353 Patent as disclosing scan data to automatically provide information.

However, Claims 1 and 9 of the '798 and '979 Patents require "automatically provid[ing]" cranial remodeling device information or cranial remodeling device trim line information.  The parties' experts both opined that although an "automatic" process may include manual steps, purely manual tasks performed on a computer where the software is simply reflecting the user's manual input are not "automatic."  (*See* Chang Depo. 198:2-15, 200:3-201:19; Mattie Depo. 539:5-540:3.)  Accordingly, a clinician performing manual modifications of a scan on a computer to create a desired head shape does not disclose "utilizing" that scan to "automatically provide" cranial remodeling device information, and the claims require utilizing or processing data produced from the captured image of a deformed head.  Figure 4's clinician-designed desired-head-shape image is not the captured image of a deformed head, and therefore Figure 4 of the '353 Patent does not anticipate.  As to Figure 6, Plaintiff's expert testified that the '353 Patent does not include a detailed description of Figure 6's "flow

---

[3] The Court construed "automatically" as its plain and ordinary meaning, and rejected Defendants' construction of "automatically" as "without human control or intervention.  (*See* Dkt. No. 134 at 17.)

[4] Defendants argue Figure 4 of the '353 Patent supports anticipation because it describes how a clinician can view and modify the patient's scan data using "commercial available software" to "determine a desired head shape image." Defendants argue n this mode, "[t]he computer 130 translates the [clinician's digitally designed] desired-head-shape image into desired-head-shape data," which Defendants contend according to Figure 4, is second data transmitted to a machine.  Defendants argue if mere computer registration of manual work in CAD software is "automatic," then Figure 4 in the '353 Patent satisfies the limitations of the asserted claims.

[5] Defendants argue based on Figure 6 that the patient scan is transmitted and necessarily used by the disclosed expert system to "select match between scan data and preferred head shape."

diagram for an expert system." (Mattie Depo. 513:23-516:8.)  Figure 6 and the descriptions in the '353 Patent do not disclose that the expert system uses the scan (or any data produced from it) to select a match between the scan data and preferred head shape.  Rather, the '353 Patent teaches that the first and second protocols based on anthropomorphic data and the patient-specific anthropomorphic data are used to select that match.  ('353 Patent at 7:9-12.)  Therefore, Figure 6 of the '353 Patent does not anticipate.

Defendants also rely on a general statement in the '353 Patent that the computer also "includes [an] expert system software which will utilize the anthropomorphic data in conjunction with the patient specific data and the scan data to design an appropriate orthosis device." (Defendants' MSJ at 17 (emphases omitted).)  However, this disclosure in the '353 Patent does not state how the scan data will be used.  The '353 Patent teaches the clinician may have the expert system (computer) display the patient scan and the desired head shape so that the "clinician can view the images 136, 137 to verify that the computer has produced an appropriate desired shape" ('353 Patent at 6:38-43), and the clinician may also use the computer to manually modify the scan to produce a desired head shape (*id.* at 6:14-22).  While the '353 Patent teaches utilizing the scan in specific ways, it does not teach utilizing the scan to "automatically" provide any "cranial device information" as required by the asserted claims.  *See Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013) ("Even when all claim limitations are found in prior art references, the fact-finder must determine what the prior art teaches, whether prior art teaches away from the claimed invention, and whether there was motivation to combine teachings from separate references.").

Defendants also refer to the '353 Patent's statement that the "computer generated corrected image is then utilized to generate a data file" which may in turn to be utilized to by automated equipment to produce a cranial remolding

11

orthosis.  The asserted claims require utilizing or processing data produced from the image of a deformed head.  However, the '353 Patent's "computer generated corrected image" that is used to produce a cranial remolding orthosis is not the scan or an "image of a deformed head."  *See Roland Corp.*, 2025 WL 926703, at *10 ("Anticipation requires the patent challenger to show by clear and convincing evidence that '***each element*** of the claim at issue, properly construed, is found in a single prior art reference.'") (Emphasis added.).

Defendants also refer to Claim 3 of the '353 Patent, which states "utiliz[ing] an expert [computer] system to modify said scan data in accordance with certain of said patient data to produce second data."  However, Claim 3 of the '353 Patent merely recites that an expert system is utilized to make modifications to the scan, and does not disclose that the expert system is utilizing the scan data to "automatically" provide any information as required by the asserted claims.  (*See* Mattie Rebuttal Report ¶ 196 (citing '353 Patent at 6:14-22).)  These manual modifications are not automatic.  *See Roland Corp.*, 2025 WL 926703, at *10.

Defendants also cite to the '353 Patent's disclosure that "the computer 130 utiliz[es] the desired head shape data along with patient specific information" to "automatically produce the final design of an orthosis."  However, this disclosure in the '353 Patent does not provide that the captured patient scan or data produced from it is utilized to automatically produce any information.  (*See* Mattie Rebuttal Report ¶¶ 174, 195, 209, 231.)  Neither the "desired head shape data" nor the "patient specific information" is the captured patient scan or data produced from it.  *See Roland Corp.*, 2025 WL 926703, at *10 ("Anticipation requires the patent challenger to show by clear and convincing evidence that '***each element*** of the claim at issue, properly construed, is found in a single prior art reference.'") (Emphasis added.).

Furthermore, Claims 1 and 9 of the '979 Patent include the limiting language "automatically provide cranial remodeling device ***trim line*** information."

(Emphasis added.)  While Defendants acknowledge that the '979 Patent includes this additional limitation regarding "trim line information," Defendants do not explain how the '353 Patent discloses the "trim line information" limitation as required for proving anticipation.  *See Schering Corp.*, 339 F.3d at 1377; *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1351 (Fed. Cir. 2013).

Accordingly, Defendants fail to meet their "heavy" burden to show "no reasonable factfinder, taking the evidence in the light most favorable to [Plaintiff], could do anything other than find clear and convincing evidence of anticipation."  *Mosaic Brands*, 55 F.4th at 1366.

**C.    Indefiniteness**

35 U.S.C. § 112(a) provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention.

"[D]efiniteness is to be evaluated from the perspective of someone skilled in the relevant art."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908 (2014). "[I]n assessing definiteness, claims are to be read in light of the patent's specification and prosecution history."  *Id*.  "A patent is invalid for indefiniteness if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Id*. at 898-99.  "[A]bsolute precision" is not required; rather "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter."  *Id*. at 899.  35 U.S.C. § 282 provides:  "A patent shall be presumed valid."  Therefore, "§ 282 requires an invalidity defense to be proved by clear and convincing evidence."  *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011).

13

Defendants contend the term "automatically" as construed by the Court to have its "plain and ordinary meaning" is not sufficiently precise or definite so a potential infringer has no way of determining what types of activities infringe or ascertaining how much manual activity falls within the scope of the "automatic" terms. Defendants thus argue because all of the asserted claims either contain the term "automatically" or depend on other independent claims with that language, all of the asserted claims of the '798 and '979 Patents are invalid as indefinite.[6]

However, Defendants' own expert Mr. Chang was able to opine on how much manual activity would or would not be considered "automatic." (*See* Chang Depo. 198:2-15, 199:21-201:10.) The parties' experts also opined on what is not automatic. (*See* Chang Depo. 200:23-201:19; Mattie Depo. 539:5-540:3.) Additionally, Plaintiff's expert Mattie opined: "In my opinion, a POSA reading the claims that require 'automatically' in view of the specification would understand with reasonable certainty that some human intervention is encompassed by the claims and thus the claims are not indefinite," and "a POSA would have understood with reasonable certainty that an automatic process, even if it includes some human intervention or control, would be within the scope of the claims and thus the claims are not indefinite." (Mattie Rebuttal Report ¶¶ 268, 272.) Furthermore, Defendants' expert conducted a non-infringement analysis of claims that include the term "automatically" (*see* Chang Rebuttal Report ¶¶ 131-34), and testified at his deposition that other software would be considered "manual" and not "automatic" (Chang Depo. 197:17-198:1). Therefore, Defendants fail to meet their burden of showing by clear and convincing evidence

---

[6] Notably, Defendants do not challenge as indefinite the asserted claims of Plaintiff's '925 and '617 Patents which also use the term "automatically" (*see* Dkt. 141-8 at 2-7) and which this Court also construed to have its plain and ordinary meaning—which is the same construction the Court adopted for the term "automatically" for the '798 and '979 Patents which Defendants challenge in the instant Motion as indefinite.

that the '798 and '979 Patents are invalid as indefinite.[7]  *See Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1347 (Fed. Cir. 2018); *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1345 (Fed. Cir. 2010).[8]

## IV.   CONCLUSION

Accordingly, the Court **DENIES** Defendants' Motion for Partial Summary Judgment of Invalidity of the Asserted Claims of U.S. Patent Nos. 7,242,798 and 7,227,979.

**IT IS SO ORDERED.**

DATED: June 11, 2026.

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

[7] Defendants also argue Plaintiff changed its position regarding the lack of human intervention as the key aspect of the patented process after surviving Defendants' motion to dismiss.  However, Plaintiff took the position at the pleading stage that "automatically" may include some human intervention.  (*See* Plaintiff's Opp. to Motion to Dismiss at 1, 12, 17.)

[8] Defendants cite to deposition testimony from the named inventor of the patents Jeanne Pomatto who Defendants contend did not have an understanding of what the word "automatically meant in her own patents.  (Defendants' SOF ¶¶ 158-59.) However, "definiteness is to be evaluated from the perspective of someone skilled in the relevant art."  *Nautilus*, 572 U.S. at 908.  As discussed above, the parties' experts' opine regarding how a skilled artisan would understand the scope of "automatically."

15